SAM PIVAR, Plaintiff

v.

T. I. MOSELEY, KEY MANAGEMENT CORPORATION and
OXFORD CORPORATION, Defendants

Civil No. 264-1969

District Court of the Virgin Islands

Division of St. Croix

June 25, 1971

THOMAS D. IRELAND, ESQ., Attorney at Law, Charlotte Amalie, St. Thomas, V.I., *for plaintiff*

THOMAS ALKON, ESQ., Attorney at Law, Christiansted, St. Croix, V.I., *for defendants*

CHRISTIAN, *Chief Judge*

This is an action for a real estate broker's commission. The plaintiff is a licensed real estate broker with principal offices in Christiansted, Virgin Islands. The corporate defendants are Virgin Islands corporations. The individual defendant was at all times pertinent to this suit the principal shareholder, president, and a member of the board of directors of each corporation.

On November 15, 1968, one Richard M. Kimbrough called at plaintiff's office and made inquiries about the availability of real estate for purchase. He had come down to the Virgin Islands from Michigan with two associates, Rockwell T. Gust, Jr. and E. Keith Owens in a joint search for real estate which they hoped to acquire and develop. They had suffered many disappointments which resulted in the other two returning to Michigan a day or so before Kimbrough's visit to plaintiff's office. Plaintiff had previously been in touch with defendant Moseley and had ascertained from him that real property owned by the de-

fendant corporations was for sale. Plaintiff therefore mentioned this property (Judith's Fancy) and offered to show it to Kimbrough. Plaintiff did, in fact, on the same day show the property to Kimbrough who expressed an enthusiastic interest. As a result of this, plaintiff called defendant Moseley and arranged an appointment for the following day. The next day, in accordance with the appointment granted by Moseley, plaintiff introduced Kimbrough to Moseley, and they discussed the possible purchase. They met again also on the following day, the 17th, and in the course of these discussions and conferences, it was brought out that Kimbrough was interested not just for himself but for his associates also, who were named in the conversations. It appears also that mention was made of Alexander Hamilton Life Insurance Company, a Michigan corporation in which Owens and Gust were the principals. At that time, there was general discussion as to methods of payment and tax considerations involved. Although there was no firm agreement, a per-acre price of $20,000.00 was mentioned. Kimbrough offered to pay a deposit, but Moseley declined to accept. He did, however, tell Kimbrough that he could have three weeks within which to determine whether he or his associates would purchase the property. Moseley promised that he would not deal with any other person or group within that three-week period. Kimbrough, having been shown the entire property by Pivar, returned and took numerous photographs to show his associates. Before leaving, he executed an offer of purchase and left a $10,000.00 check with Pivar. The offer was transmitted to Moseley, but he never executed it.

Owens and Gust, fired by the enthusiasm of Kimbrough, immediately became involved in the property. They learned for the first time that the owners of the corporations which owned the land were defendant Mose-

229

ley and Warren H. Young, attorney for the corporations. Like Moseley, Young was an officer and director of each of the two corporations. As it turned out, Estate Judith's Fancy had been mentioned to the joint venturers at some earlier time by Mr. Young, when they had been meeting with him in an effort to purchase other property owned by other clients of his. As a result of Young's mention of the property, they had asked a taxi driver to drive by the estate and show them the property, but they had seen only a small part of it, not including the bay and marina, did not like what they saw and had shown no interest whatsoever.

As a direct result of the information received from Kimbrough, Owens and Gust got in touch with Moseley. It appears that he was then in California, and they arranged to visit him at his home for discussion and negotiations. Their interest in the premises had earlier been relayed to Moseley. Prior to their California visit, Kimbrough received a letter from Moseley, which was, in effect, an offer to sell, and which outlined the properties in question and the prices. This letter Kimbrough passed on to Owens and Gust.

It was contemplated by Kimbrough, Owens and Gust that they would be the persons who would buy the property. They had previously formed Caribbean International Trust Company, a Virgin Islands corporation through which they hoped to acquire and improve land. At first, they thought they would use this corporation as the vehicle for the acquisition of the Judith's Fancy property, but after their talk with Mr. Moseley, it became readily apparent that Caribbean could not manage a transaction of that magnitude. Owens and Gust then contemplated using Alexander Hamilton Life Insurance Company as the purchaser, but again had to discard this idea because of certain restrictions in the corporate laws of the State

of Michigan. They finally agreed to use Hamilton International Corporation as buyer. Hamilton International Corporation is wholly owned by Alexander Hamilton Life Insurance Company. Gust was at the time vice president, general counsel and secretary of Alexander Hamilton Life Insurance Company as well as Hamilton International. Owens likewise was interested in each of the two corporations. He was principal owner and chairman of the board of Hamilton International Corporation.

Then followed a series of negotiations and discussions between the parties as to the best method of consummating the transaction. From as early as November 27, 1968 and earlier, as evidenced by a letter from Mr. Moseley's California attorney to Young, his Virgin Islands counsel, various methods were being considered. Copy of this letter was made available to Pivar through Young's office, by direction of Moseley. In the course of these discussions, some additional property was thrown into the deal. Eventually, a written agreement was executed some time in February of 1969 and on or about May 24, 1969, the transaction was closed. Instead of a purchase and sale of land for cash, as was initially contemplated, the final transaction was the acquisition of the stock of the corporate defendants by Hamilton International Corporation and the acquisition by the defendant Moseley of a given number of shares of the stock of Hamilton International. Subsequently, Hamilton International entered into an agreement with Moseley to redeem his shares of stock of that corporation at specific times in the future and at agreed prices. In the final transaction, Kimbrough, who at no time owned an interest in Alexander Hamilton Life Insurance Company or Hamilton International Corporation, acquired no interest in Judith's Fancy Estates. Another corporation, Columbus Landing Corporation, a Virgin Islands corporation was formed. Kimbrough was president

231

of this corporation and a 45% stockholder. The other 55% of the stock of Columbus was owned by Hamilton International Corporation. There was an agreement between Hamilton International Corporation and Columbus Landing Corporation that the latter would develop a portion of the land for Hamilton International Corporation. This was to be Kimbrough's compensation for his efforts.

The new officers of the defendant corporations following the consummation of the transaction were E. Keith Owens, president and director, Alyn A. Fletcher, vice president and treasurer and a director, Rockwell T. Gust, secretary and a director, and Warren H. Young, assistant secretary.

It is admitted that at no time after the initial discussions between Moseley, Kimbrough and Pivar did plaintiff Pivar participate in any way in the negotiations. The actual resolution of the problems posed by the transaction were resolved in negotiations between Owens and Gust on the one side and Moseley and his lawyers on the other. It was the ingenuity of Moseley's lawyers, Young in particular, that saved the transaction when it seemed about to die. It is claimed by the defendants that, because of this lack of participation by plaintiff, he cannot recover. It is also claimed by the defendants that what was consummated in May of 1969 was an entirely different transaction from that contemplated in November of 1968. Admittedly, additional property was brought into the bargain. Also admitted is the fact that Kimbrough, Pivar's initial prospect, did not figure in the final transaction as a purchaser, and while it appears that there was mention of Alexander Hamilton Life Insurance Company, Hamilton International Corporation, the ultimate purchaser had not been mentioned at the early stages by Kimbrough in his conferences with Pivar and Moseley, nor

had that corporation then been in contemplation as purchaser. For all of these reasons, defendants say that plaintiff is not entitled to a commission. I do not agree.

 I find on all the evidence a continuous chain albeit with starts and stops and intervening obstacles, from the showing of the property by Pivar to Kimbrough and their conferences and discussions with Moseley in November of 1968, through Kimbrough's transmission of all his information (and enthusiasm) to Gust and Owens, on to their negotiations with Moseley and his counsel, and up to the final acquisition of the stock of the two defendant corporations by Hamilton International, which for all practical purposes effected the purchase and sale of the land. I do not regard it as essential to a broker's right to a commission that he should have participated in all or indeed in any of the negotiations once he brought buyer and seller together. I am satisfied that the efforts of Pivar is the foundation on which this transaction was consummated. The ultimate purchasers are, I find, the same ones mentioned by Kimbrough at the outset, although they have not acted as natural persons, but have effectively acquired ownership through their interest and holdings in Hamilton International Corporation. The same two persons, Gust and Owens are the persons who now control the two corporate defendants, and as Rockwell Gust himself said, they learned of the owners of the property from Kimbrough. Their interest in the property was aroused by Kimbrough and, but for Kimbrough's interest in the property, they would have shown none. I conclude that the plaintiff is entitled to a commission.

The question now becomes on what sum is the plaintiff entitled to be paid a commission. When Kimbrough and Moseley first opened negotiations, they were talking, as I gather from the evidence, of real property valued at $1,525,000.00. In addition to that, their negotiations in-

cluded the possible purchase by Kimbrough and his associates of a residence belonging to the defendant Moseley. It appears from the evidence that the value placed on this residence was $73,000.00. At least plaintiff so testified. When the transaction was closed, however, the total value for the real property involved was $2,625,000.00. Plaintiff claims a commission on this total amount.

 I am of the opinion that, all of the circumstances in this transaction considered, the plaintiff is entitled to be paid a commission only on the value of such property of which it can be said his efforts brought about a purchase and sale. While there is some sparse authority that allows a broker a commission on additional real property included in the course of negotiations, in this particular case where the additional property was included because of certain considerations bearing no relationship to the broker's efforts, it would not seem that a commission should be allowed on all of the property involved. The plaintiff is entitled to a commission on the property initially involved in the transaction valued at $1,525,000.00. He is also entitled to a commission on the value of the residence which was included in the sale, i.e. $73,000.00.

Finally, the rate at which the plaintiff is to be paid a commission remains to be determined. The sale was closed on May 24, 1969. On December 17, 1968, plaintiff had written to defendant Moseley enclosing a copy of the standard commission rates then in effect as agreed to by St. Croix realtors. Under those accepted rates it was provided that the percentage to be paid the broker on anything in excess of $1,000,000.00 for sale of land of the type here involved was to be negotiated between the parties. Plaintiff at that time suggested a rate of $1\frac{1}{2}\%$ as being a fair rate.

 At the trial, plaintiff introduced a new listing of recommended new commission rates which went into ef-

fect July 1, 1969. For this type of property, these rates were substantially the same as those which had been in effect since December 15, 1967, copy of which plaintiff had sent to Moseley. The difference was that the new rates recommended a figure of 2% on any portion in excess of $1,000,000.00. Plaintiff called a local realtor as a witness, and this realtor testified that in his opinion, for a sale closed in May 1969, the reasonable commission on the portion between $1,000,000.00–$2,000,000.00 would be 2% and on the portion between $2,000,000.00–$3,000,000.00 the reasonable rate would be 1½%. Plaintiff himself testified that he would consider 2% on any amount in excess of $1,000,000.00 as reasonable, and this is the amount he seeks. I am of the opinion that plaintiff's compensation should be restricted to the rate in force at the time of the negotiation. His sending a copy of the standard rates then in effect to Moseley is a clear indication of his intention to be bound by those rates. Plaintiff should not be permitted to recover more than the 1½% which he advanced to defendants as reasonable by the mere fortuitous circumstance that in the interim the Board of Realtors recommended a higher amount. When plaintiff wrote to defendant Moseley on June 20, 1969 demanding his commission, he again requested that "I be paid the sales commission on this transaction, based on the standard rates of commission which are observed by the St. Croix Board of Realtors." Certainly, even at this late date, his reference must have been to the rates which he had submitted to defendants. There can be little doubt that if the sale had been concluded and the commission paid without any disagreement between the parties, plaintiff's compensation would have been limited to that rate. It is to compensation at those rates that I hold plaintiff to be entitled. Let judgment enter accordingly.